Opinion issued February 26, 2003






            

  










In The
Court of Appeals
For The
First District of Texas




NO. 01-00-01250-CV




STANDARD CONSTRUCTORS, INC., Appellant

V.

CHEVRON CHEMICAL COMPANY, INC., Appellee




On Appeal from the 125th District Court of
Harris County, Texas
Trial Court Cause No. 98-29650




DISSENTING OPINION

          I respectfully dissent. In my opinion, the trial court erred in ruling that, as a
matter of law, the contract in question barred appellant’s claim for payment for
overtime use of equipment on an hourly basis. Accordingly, we should sustain
appellant’s first issue and reverse and remand this case for a new trial.
Analysis
          It is clear from the contract that Exhibit “F” is an alphabetical list of the
different types of equipment Standard could use during its construction and
maintenance work, and that it breaks down the rates Standard can charge for each
type of equipment into four categories, which include, “Hourly (1),” “Daily (8),”
“Weekly (40),” and “Monthly (176).” (Emphasis added.) In some instances, the
parties agreed to assign certain types of equipment a “daily,” “weekly,” and
“monthly” rate, and in others, the parties assigned only “hourly” rates. This is
undisputed.
          However, for a majority of the types of equipment, the parties inserted the
abbreviation “N/A,” or “not applicable,” in the “hourly” column. Chevron argues that
the term “N/A,” as it is used in the contract, demonstrates the parties’ intention that
hourly rates were not to be charged for those items with an “N/A” in their “hourly”
rate column, whether that hourly rate would have been for “straight” time or for
“overtime.” Standard contends that the abbreviation “N/A” should be interpreted in
conjunction with the numbers (1), (8), (40), and (176), which appear at the top of
Exhibit “F.” Standard claims that the contract permits charges for the overtime use
of equipment, regardless of the term “N/A,” because the applicable overtime rates
will depend entirely on how long a particular piece of equipment is used.
          In support of its argument, Standard points to the construction industry’s 
general standards and trade practices in order to define what the term “N/A” means
in connection with the numbers (1), (8), (40), and (176). The Associated Equipment
Distributor’s (AED) Green Book,


 which sets forth rental rates for all types of
equipment used in the construction industry, was admitted into evidence at the
pretrial hearing. The Green Book is a nationally publicized information booklet that
compiles the general industry practices of thousands of construction companies in the
United States and Canada.
          According to the Green Book, the numbers (8), (40), and (176) have a distinct
meaning within the construction industry. The Green Book states that “[i]t is the
general practice in the industry to base rates upon one shift of 8 hours per day, 40
hours per week, or 176 hours per month of a 30-day consecutive period.”


 This
explanation gives the numbers at the top of Exhibit “F” a definite meaning and
supports Standard’s interpretation of the contract.
          In addition, the Green Book establishes a general practice in the construction
industry that companies normally charge for overtime use of equipment. Specifically,
the Green Book provides as follows:
If the equipment is rented by the day, the rate for overtime is one-eighth
of the daily rate for each hour in excess of eight. If it is rented by the
week, the rate for overtime is 1/40 of the weekly rate for each hour in
excess of 40. If it is rented by the month, the overtime rate is 1/176 of
the monthly rate for each hour in excess of 176 hours in any one 30-day
consecutive period.



 
           Chevron put on evidence that, during the three years before this contract, when 

Chevron and Standard operated under a similar contract, Standard had never charged 

Chevron for overtime use of equipment. Standard responded with evidence that the 

overtime use of equipment never came up until the flood of October 1994, which
severely damaged Chevron’s plant and required rebuilding on an emergency basis
under the contract at issue.
          Extrinsic evidence may “be admissible to give the words of a contract a
meaning consistent with that to which they are reasonably susceptible, i.e., to
‘interpret’ contractual terms.” Mescalero Energy, Inc. v. Underwriters Indem. Gen.
Agency, Inc., 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)
(quoting Nat’l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex.
1995)). “[A] specialized industry or trade term may require extrinsic evidence of the
commonly understood meaning of the term within a particular industry.” Mescalero
Energy, 56 S.W.3d at 320; see also Nat’l Union, 907 S.W.2d at 521 n. 6 (holding
extrinsic evidence may be considered when interpreting meaning of terms used in
particular “place, vocation, trade, or industry”). Courts may refer to extrinsic
evidence such as industry dictionaries to determine the commonly understood
meaning of an industry term. Mescalero Energy, 56 S.W.3d at 323. Many courts
have used expert definitions to determine the meaning of specialized terms before
deciding whether an instrument is ambiguous. Id.
          In this case, the Green Book’s interpretation of the numbers (8), (40), and
(176), as they were used in Exhibit “F,” supports Standard’s construction of the
parties’ contract that would allow it to charge for overtime use of equipment. I would
hold that the contract is therefore subject to two reasonable interpretations. Thus, the
trial court erred in ruling, as a matter of law, that the contract unambiguously barred
Standard’s claim for equipment overtime charges. This error probably caused the
rendition of an improper judgment, and therefore is reversible error. See Tex. R. App.
P. 44.1(a).
          Accordingly, I would sustain Standard’s first issue and not reach the merits of
the remaining issues.
Conclusion
          I would reverse the judgment and remand the case to the trial court.
 


                                                                        Margaret Garner Mirabal
                                                                        Justice
 
Panel consists of Justices Hedges, Jennings, and Mirabal.



 
Justice Mirabal dissenting.