NUMBER 13-06-352-CV


 

COURT OF APPEALS
 


THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


ENDEAVOR NATURAL GAS, L.P., ACTING

THROUGH ITS GENERAL PARTNER, ENG

MANAGEMENT, L.L.C., FORMERLY KNOWN

AS ENDEAVOR NATURAL GAS, L.L.C., Appellants,


v.


MAGNUM HUNTER PRODUCTION, INC.,

PRIZE ENERGY RESOURCES, L.P., AND 

PRIZE OPERATING COMPANY, Appellees.

 


On appeal from the 24th District Court of Victoria County, Texas.


 

 

MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Benavides


Memorandum Opinion by Justice Garza
 

In this lawsuit, appellant Endeavor Natural Gas, L.P., acting through its general
partner, ENG Management, L.L.C. (collectively "Endeavor"), is attempting to recover
$766,472.72 in severance tax refunds and credits received from the State of Texas by
appellees, Magnum Hunter Production Inc., Prize Energy Resources, L.P., and Prize
Operating Company (collectively "Magnum Hunter"). The trial court granted Magnum
Hunter's cross motion for summary judgment and denied Endeavor's motion for partial
summary judgment on liability. By three issues, Endeavor contends that the judgment
rendered by the trial court should be reversed because: (1) the trial court erred in
construing the contract governing the conveyance of oil and gas properties from Magnum
Hunter to Endeavor; (2) the trial court erred by failing to rule on or by implicitly overruling
its objections to Magnum Hunter's summary judgment evidence; and (3) a fact issue exists
regarding the intent of the parties to the contract, thus rendering the trial court's granting
of Magnum Hunter's motion for summary judgment improper. We affirm.

I. Factual & Procedural Background


In an Assignment and Bill of Sale (the "Assignment") executed December 27, 2002, 

Endeavor bought oil and gas properties ("Subject Wells") in Victoria County, Texas from
Magnum Hunter with an effective date of December 1, 2002. The Assignment provided
that Magnum Hunter was entitled to "amounts realized from and accruing to the Subject
Wells" before December 1, 2002, while Endeavor was entitled to "amounts realized from
and accruing to the Subject Wells" after December 1, 2002. 

Subsequently, Magnum Hunter prepared a letter (the "Letter Agreement") dated
January 23, 2003, which reduced to writing an oral agreement between Dan Harrison of
Magnum Hunter and Rick Jenner of Endeavor with regard to the "Chicago-Pneumatic
(Model 665-FE22) Compressor, Serial #17XX65X23, with Waukesah 3711 engine
('equipment') installed for the production from the subject Wells." The equipment was to
be used for oil and gas production on the Cooley No. 3 and Cooley No. 4 wells, which were
among the Subject Wells. Moreover, the Letter Agreement contained the following clause:

[A]ll post-closing adjustments related to the sale by MHR [Magnum Hunter]
of the subject properties to Endeavor will be made on or before June 1,
2003, and thereafter all expenses and revenue attributable to operations on
and production from the subject Wells before or after December 1, 2002, if
any will be the responsibility of and inure to the benefit of Endeavor.

 

The Letter Agreement was signed and dated by Gayle Arnold of Magnum Hunter and Tom
E. Young of Endeavor on January 24, 2003. The underlying dispute arose when Magnum Hunter received $766,472.72 in gross
tax credits and refunds from the State of Texas. Magnum Hunter notes that the tax
refunds and credits correspond to Magnum Hunter's overpayment of severance taxes (1)
 for
minerals produced from the Cooley No. 4 well from January 2001 through November 2002. 
The record reflects that the severance tax refund applications were made on February 24,
2003, May 12, 2003, August 8, 2003, August 11, 2003, August 12, 2003, and June 3,
2004. In addition, $242,711.32 of the $766,472.72 severance tax refunds Magnum Hunter
received from the State of Texas was a cash refund with the remaining balance credited
against Magnum Hunter's severance tax liability on other wells in later production months. (2)
 

On January 13, 2005, Endeavor filed suit against Magnum Hunter alleging that
Magnum Hunter had breached the Assignment and the Letter Agreement by failing to give
Endeavor the severance tax proceeds that Magnum Hunter received from the State of
Texas. On August 19, 2005, Endeavor moved for partial summary judgment on liability. (3) 
On September 9, 2005, Magnum Hunter filed its response to Endeavor's partial summary
judgment motion on liability, which was accompanied by a cross-motion for summary
judgment. 

At the crux of the dispute is the classification of the tax credits and refunds. 
Endeavor argues they are "recovered payments and credits" that constitute "expenses .
. . attributable to operations before or after December 1, 2002" and are, therefore, covered
by the letter agreement. Magnum Hunter, on the other hand, argues they are neither 
"expenses" nor "revenues" and that the language in the Assignment governs.

In its final judgment dated March 17, 2006, the trial court denied Endeavor's motion
for partial summary judgment on liability and granted Magnum Hunter's motion for
summary judgment. Moreover, the trial court held that Endeavor "shall take nothing in this
cause from Defendants Magnum Hunter Production, Inc., Prize Energy Resources, L.P.,
or Prize Operating Company." On April 13, 2006, Endeavor moved for a new trial. The
trial court did not rule on Endeavor's motion for a new trial, and it was, subsequently,
overruled by operation of law. See Tex. R. App. P. 33.1(b). This appeal ensued. 

II. Standard of Review


The function of summary judgment is to eliminate patently unmeritorious claims and
defenses, not to deprive litigants of the right to a trial by jury. Tex. Dep't of Parks & Wildlife
v. Miranda, 133 S.W.3d 217, 228 (Tex. 2004) (citing Casso v. Brand, 776 S.W.2d 551, 556
(Tex. 1989)); Alaniz v. Hoyt, 105 S.W.3d 330, 344 (Tex. App.-Corpus Christi 2003, no
pet.). We review de novo a trial court's grant or denial of a traditional motion for summary
judgment. Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 816 n.7 (Tex. 2005) (citing
Schneider Nat'l Carriers, Inc. v. Bates, 147 S.W.3d 264, 290 n.137 (Tex. 2004)); Alaniz,
105 S.W.3d at 345. 

Under a traditional motion for summary judgment, the movant must establish that
no material fact issue exists and that it is entitled to judgment as a matter of law. Tex. R.
Civ. P. 166a(c); Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); Alaniz,
105 S.W.3d at 345; Mowbray v. Avery, 76 S.W.3d 663, 690 (Tex. App.-Corpus Christi
2002, pet. denied). After the movant produces evidence sufficient to show it is entitled to
summary judgment, the nonmovant must then present evidence raising a fact issue. See
Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996). Where, as here, both parties move
for summary judgment, and the trial court grants one motion and denies the other, we
review both parties' motions for summary judgment and determine whether the trial court
erred in its decision. Tex. Workers' Comp. Comm'n v. Patient Advocates, 136 S.W.3d 643,
648 (Tex. 2004); Dow Chem. Co. v. Bright, 89 S.W.3d 602, 605 (Tex. 2002); Parker v.
Parker, 131 S.W.3d 524, 530 (Tex. App.-Fort Worth 2004, pet. denied). Moreover, "when
a trial court's order granting summary judgment does not specify the ground or grounds
relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories
advanced are meritorious." Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001)
(quoting Carr v. Brasher, 776 S.W.2d 567, 569 (Tex. 1989)).

III. Contract Interpretation


In their respective motions for summary judgment, both Endeavor and Magnum
Hunter argue entitlement to the $766,472.72 in severance tax refunds and credits that
Magnum Hunter received from the State of Texas based upon a strict construction of the
Assignment and the Letter Agreement. In the alternative, Magnum Hunter argues that the
Assignment and the Letter Agreement are ambiguous.

A. Contract interpretation principles

 The interpretation of an unambiguous contract is a question of law for the court to
decide. Am. Std. v. Brownsville Indep. Sch. Dist., 196 S.W.3d 774, 781 (Tex. 2006) (citing 
J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003)); Columbia Gas
Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996); Barrand, Inc.
v. Whataburger, Inc., 214 S.W.3d 122, 129 (Tex. App.-Corpus Christi 2006, pet. denied). 
Contracts that are not deemed to be ambiguous are enforced as written. See, e.g.,
Heritage Res., Inc. v. Nationsbank, 939 S.W.2d 118, 121 (Tex. 1996). When a contract
contains an ambiguity, the granting of a motion for summary judgment is improper because
the interpretation of the instrument is a question of fact for the jury. Barrand, 214 S.W.3d
at 129 (citing Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 529 (Tex. 1987)). 

 If a written contract is worded so that it can be given a definite or certain legal
meaning, then it is unambiguous. See Gulf Ins. Co. v. Burns Motors, 22 S.W.3d 417, 423
(Tex. 2000); see also Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983); Cook
Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 131 (Tex. App.-Houston
[14th Dist.] 2000, pet. dism'd). An ambiguity does not arise simply because the parties
offer conflicting interpretations. Am. Std., 196 S.W.3d at 781; Lopez v. Munoz, Hockema
& Reed, 22 S.W.3d 857, 861 (Tex. 2000); Kelley-Coppedge, Inc. v. Highlands, 980 S.W.2d
462, 465 (Tex. 1998); Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co., 3 S.W.3d
112, 128 (Tex. App.-Corpus Christi 1999, pet. denied). Inartful drafting does not alone
render contractual provisions ambiguous. See Am. Std., 196 S.W.3d at 781. Rather, a
contract is ambiguous only if two or more meanings are genuinely possible after application
of the pertinent rules of interpretation to the face of the instrument. Columbia Gas
Transmission Corp., 940 S.W.2d at 589. 

 In construing a contract, we must ascertain and give effect to the parties' intentions
as expressed in the document. J.M. Davidson, Inc., 128 S.W.3d at 229; Nat'l Union Fire
Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) (per curiam). We consider
the entire writing and attempt to harmonize and give effect to all the provisions of the
contract by analyzing the provisions with reference to the whole agreement. J.M.
Davidson, Inc., 128 S.W.3d at 229; Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex.
1981); Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc., 56 S.W.3d 313,
319 (Tex. App.-Houston [1st Dist.] 2001, pet. denied). Furthermore, we construe contracts
"from a utilitarian standpoint bearing in mind the particular business activity sought to be
served" and "will avoid when possible and proper a construction which is unreasonable,
inequitable, and oppressive." Reilly, 727 S.W.2d at 530; Hewlett-Packard Co. v.
Benchmark Elecs., Inc., 142 S.W.3d 554, 561 (Tex. App.-Houston [14th Dist.] 2004, pet.
denied).

 Under generally accepted principles of contract interpretation, all writings pertaining
to the same transaction will be considered together, even if they were executed at different
times and do not expressly refer to one another. Fort Worth Indep. Sch. Dist. v. City of
Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000); Dewitt County Elec. Coop., Inc. v. Parks, 1
S.W.3d 96, 102 (Tex. 1999). A court may determine, as a matter of law, that multiple
documents comprise a written contract, and, in appropriate instances, may construe all the
documents as if they were part of a single, unified instrument. Courage Co., L.L.C. v.
Chemshare Corp., 93 S.W.3d 323, 333 (Tex. App.-Houston [14th Dist.] 2002, no pet.)
(citing Fort Worth Indep. Sch. Dist., 22 S.W.3d at 840). Here, the Assignment and the
Letter Agreement should be considered in determining the intent of the parties considering
both pertain to the same transaction: the conveyance of the Subject Wells from Magnum
Hunter to Endeavor. See Fort Worth Indep. Sch. Dist., 22 S.W.3d at 840; Dewitt County
Elec. Coop., Inc., 1 S.W.3d at 102; Courage Co., L.L.C., 93 S.W.3d at 333. We will,
therefore, read the contracts together. See Gulf Constr. Co. v. Self, 676 S.W.2d 624, 627
(Tex. App.-Corpus Christi 1984, writ ref'd n.r.e.) (quoting Abilene v. Tex. & Pac. RR Co.,
150 S.W.2d 1003, 1006 (Tex. 1941) ("It is the duty of the Court, in determining the
meaning and intent of a contract, to look to the entire instrument; that is, the contract must
be examined from its four corners.")). B. Application 

 The Assignment provides for the transfer to Endeavor of:

 [A]ll of Assignor's [Magnum Hunter] right, title, and interest in and to the Oil,
Gas and Mineral Lease and the Pipeline Right-of-Way Agreements
described in Exhibit "A" attached hereto and made a part hereof . . . subject
to the reservations set out below and on Exhibit "A."

 

 . . . .

 

 For the same consideration heretofore stated, Assignor [Magnum Hunter]
does hereby sell, assign, transfer and convey unto Assignee [Endeavor] all
of Assignor's right, title and interest in and to the wells and dripping stations
described on Exhibit "B," hereinafter referred to as the "Subject Wells",
together with all of Assignor's right, title and interest in and to all personal
property, fixtures, machinery and equipment situated on or under the Subject
Properties and Subject Wells or used or obtained in connection therewith,
and the oil and gas produced from or allocated to the Subject Wells.

 

Within the Assignment, Magnum Hunter expressly reserved an overriding non-participating royalty interest, which was "subject to any provisions therein regarding costs
or expenses including a proportionate part of all applicable severance and production
taxes." The Assignment further provides that:

All equipment and other personal property and fixtures used in connection
with the Subject Wells are being transferred on a "WHERE IS" and "AS IS"
basis, and Assignor [Magnum Hunter] makes no representations or
warranties, either express or implied, as to particular use or uses of any such
equipment or other personal property or fixtures, all of such representations
or warranties being hereby expressly excluded and denied.

 

 . . . .


Assignee [Endeavor] shall be entitled to any amount realized from and
accruing to the Subject Wells subsequent to the effective date of this
Assignment and Bill of Sale and shall bear and pay all costs, expenses, and
obligations attributable to the Subject Wells which relate to periods
subsequent to the effective date. Assignor [Magnum Hunter] shall be entitled
to all the amounts realized from and accruing to the Subject Wells prior to
the effective date and shall indemnify and hold Assignee harmless from any
liability arising out of all expenses for the development and operation of the
Subject Wells prior to the effective date. Ad valorem taxes for the year of
2002 shall be borne and paid by Assignor and Assignee in the proportions
of 11/12ths by Assignor and 1/12th by Assignee.


. . . . 


To Assignor's [Magnum Hunter] knowledge, all ad valorem, property,
production, severance, excise and similar taxes and assessments based on
or measured by the ownership of the Subject Properties or the production of
Hydrocarbons or the receipts of proceeds therefrom that have become due
and payable have been paid in all materials respects. 


(Emphasis in original). The parties indicated in the Assignment that the effective date of
the contract was December 1, 2002.

The record reflects that the severance taxes were paid on production from the
Cooley No. 4 well from January 2001 to November 2002. Moreover, the severance tax
refunds and credits constituted an overpayment of tax liability by Magnum Hunter from
January 2001 to November 2002, and, therefore, accrued to Magnum Hunter prior to the
December 1, 2002 effective date despite not being paid by the comptroller's office until
much later. (4)
 The Assignment clearly provides that Magnum Hunter is entitled to "amounts
realized from and accruing to the Subject Wells" before December 1, 2002, and Endeavor
is entitled to "amounts realized from and accruing to the Subject Wells" after December 1,
2002. Accordingly, we conclude that the parties intended December 1, 2002 to be a clear
line of demarcation in the Assignment. This conclusion is further supported by (1) Magnum
Hunter's sale of the properties on an "as is" basis, (2) its agreement to indemnify and hold
Endeavor harmless from liability arising before December 1, 2002, and (3) its refusal to
warrant any personal property or fixtures or assume liability on behalf of Endeavor after
December 1, 2002. 

However, Endeavor and Magnum Hunter entered into a subsequent agreement, the
Letter Agreement, which was drafted on January 23, 2003 and signed on January 24,
2003. As previously stated, the purpose of the Letter Agreement was to reduce to writing
an oral agreement between Dan Harrison of Magnum Hunter and Rick Jenner of Endeavor
for equipment to be used on the Cooley No. 3 and No. 4 wells. Specifically, the Letter
Agreement provides: 

[A]ll post-closing adjustments related to the sale by MHR [Magnum Hunter]
of the subject properties to Endeavor will be made on or before June 1,
2003, and thereafter all expenses and revenue attributable to operations on
and production from the subject Wells before or after December 1, 2002, if
any will be the responsibility of and inure to the benefit of Endeavor. (5)


Endeavor argues that the Letter Agreement materially modifies explicit and implicit
reservations made by Magnum Hunter in the Assignment. Specifically, Endeavor asserts
that the following language in the Letter Agreement: "expenses and revenue attributable
to operations on and production from the subject Wells before or after December 1, 2002,
if any will be the responsibility of and inure to the benefit of Endeavor" modifies the
following language from the Assignment: "Assignor shall be entitled to all amounts realized
from and accruing to the Subject Wells prior to the effective date." Endeavor further
argues that because "taxes are considered 'expenses,' under Texas law," the tax refunds
and credits are necessarily encompassed by the language in the Letter Agreement. We
must, therefore, determine what the parties intended in using the terms "expenses" and
"revenues" in the Letter Agreement and whether the Assignment was modified by this latter
agreement. 

We give terms their plain, ordinary, and generally accepted meaning unless the
contract shows the parties used them in a technical or different sense. Heritage Res., Inc.,
939 S.W.2d at 121 (citing W. Reserve Life Ins. Co. v. Meadows, 261 S.W.2d 554, 557
(Tex. 1953)). It is clear, in reviewing the record, that the parties did not intend for these
terms to be used in a technical or different sense. Only after the underlying suit was
initiated did the parties assert that these terms have some rarefied definition within the
energy industry. 

In giving these terms their plain, ordinary, and generally accepted meaning, an
"expense" is "[a]n expenditure of money, time, labor, or resources to accomplish a result,
especially, a business expenditure chargeable against revenue for a specific period." 
Black's Law Dictionary 473 (7th ed. 2000). Clearly, the severance tax refunds and
credits would not constitute an expense for either Magnum Hunter or Endeavor as they
were monies received rather than expended. See id. While Endeavor correctly articulates
that taxes are considered "expenses" under Texas law, Aerospace Optimist Club v. Tex.
Alcoholic Beverage Comm'n, 886 S.W.2d 556, 561 (Tex. App.-Austin 1994, no writ),
Endeavor fails to provide us with any authority, nor have we found any, that compels us
to conclude that tax credits or refunds are properly classified as expenses. 

 "Revenues" are "gross income or receipts." Black's Law Dictionary, at 1057. 
Gross income is defined as "[t]otal income from all sources before deductions, exemptions,
or other tax reductions" with income meaning "money or other form of payment that one
receives, usually periodically, from employment, business, investments, royalties, gifts, and
the like." Id. at 611-12. Finally, gross receipts are "the total amount of money or other
consideration received by a business taxpayer for goods sold or services performed in a
year, before deductions." Id. at 569. Under these definitions, the severance tax refunds
and credits are not "revenue" because they are not a form of payment for goods, services,
or investments. The severance tax refunds and credits were an overpayment of tax liability
on the part of Magnum Hunter. See Tex. Tax Code Ann. § 111.104 (Vernon 2001). 
Therefore, the severance tax refunds and credits constitute monies wrongfully exacted by
the State of Texas, which necessitated a return to the taxpayer, Magnum Hunter. See id. 

In reviewing case law regarding the characterization of tax refunds, the United
States Court of Federal Claims has noted "the return to the taxpayer of the property he had
tried to give away cannot possibly be considered as income--he merely got back his own
property." (6) Cal. & Haw. Sugar Ref. Corp. v. United States, 311 F.2d 235, 237 (Ct. Cl.
1962) (citing Perry v. United States, 160 F. Supp. 270, 271 (1958), overruled on other
grounds by Alice Phelan Sullivan Corp. v. United States, 381 F.2d 399, 403 (Ct. Cl. 1967)). 
The Federal Claims Court has further noted that "a recovery of monies wrongfully exacted
by the government is not income at all but a return of capital funds illegally taken from the
taxpayer. . . ." Id. (citing Ben Bimberg & Co., Inc. v. Helvering, 126 F.2d 412, 414 (2d Cir.
1942)). The State of Texas, in issuing severance tax refunds and credits to Magnum
Hunter, was merely returning property back to its rightful owner. See id.; Helvering, 126
F.2d at 414. Based on the foregoing, we conclude that the severance tax refunds and
credits received by Magnum Hunter from the Comptroller's office are not expenses or
revenue within the ambit of the Letter Agreement. 

We agree with Endeavor that the Letter Agreement modified the Assignment as it
pertained to expenses and revenue; however, because the severance tax refunds and
credits are not expenses or revenue, the broader language in the Assignment governs. 
See Courage Co., L.L.C., 93 S.W.3d at 333 (citing Fort Worth Indep. Sch. Dist., 22 S.W.3d
at 840) (noting that we can construe multiple contracts pertaining to a particular transaction
as "part of a single, unified instrument"). We conclude that the severance tax refunds and
credits are "amounts realized from and accruing to Subject Wells prior to the effective
date." Accordingly, the trial court did not err in denying Endeavor's motion for partial
summary judgment and in granting Magnum Hunter's motion for summary judgment. We,
therefore, overrule Endeavor's first issue.

IV. Objections to Summary Judgment Evidence 

By its second issue, Endeavor contends that the trial court erred by failing to rule
on or by implicitly overruling its objections to Magnum Hunter's summary judgment
evidence--expert witness affidavits of Richard S. Ferrell, Vice President-Land (Onshore)
for Magnum Hunter, and Michael Beard, Senior Financial Analyst at Magnum Hunter. 
Endeavor further contends that by implicitly overruling its objections to Magnum Hunter's
summary judgment evidence, the trial court committed harmful error. Magnum Hunter
counters that the admission of its expert witness affidavits was, at best, harmless error and
that the affidavits contain competent and admissible opinions that supported their motion
for summary judgment. See Tex. R. Civ. P. 166a(f). Nonetheless, because we have
construed the contract as a matter of law without resorting to the evidence of which
Endeavor objects, we conclude any error was harmless. See Tex. R. App. P. 44.1(a). 
Accordingly, we overrule Endeavor's second issue.

V. Remaining Fact Issues 

By its third issue, Endeavor argues that fact issues remain regarding the intent of
the parties to the agreements. In particular, Endeavor asserts that fact issues remain
regarding the intent of the parties governing the definitions of "expenses" and "revenues,"
as contained in the Letter Agreement and how the Letter Agreement corresponds to the
"all of Assignor's right, title and interest" language in the Assignment. However,
considering we have already construed the unambiguous contract as a matter of law, no
fact issues remain. We, therefore, overrule Endeavor's third issue.

VI. Conclusion

Having overruled all of Endeavor's issues, we affirm the judgment of the trial court. 

 

 ___________________________ 

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 13th day of December, 2007.

1. 
 [1] "In addition to income taxes, oil and gas companies pay severance taxes to state governments as 

well as a range of other non-payroll related taxes. . . . Severance taxes represent a percentage of production
that must be paid to the state, regardless of whether the oil or gas is on state, federal, or private lands." Am.
Petroleum Institute, Taxes: Taxes on Exploration and Production, available at
http://www.api.org/aboutoilgas/sectors/explore/taxes.cfm (last visited Oct. 18, 2007).

 

 In Texas, a severance tax on natural gas or oil is payable by the producer, unless the purchaser takes
delivery of the gas on the premises where it is produced, or unless the parties otherwise agree. See Tex. Tax
Code Ann. §§ 201.051, 201.204, 201.2041, 201.251, 202.051, 202.154, 202.155 (Vernon 2002). 

2. " 
 " 


 


 
 

 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

3. 
 
 
 
 
4. 
 
 
 

 

Tex. Tax Code Ann. § 111.104 (Vernon 2001).

5. " " ' 

6.