Motion for Rehearing Overruled; Affirmed; Opinion of May 26, 2005,
Withdrawn and 









Motion for Rehearing Overruled;
Affirmed; Opinion of May 26, 2005, Withdrawn and 

Substitute Opinion filed April 28, 2006.

 

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-03-01198-CV

_______________

 

XCO PRODUCTION COMPANY, Appellant

 

V.

 

BRUCE L. JAMISON AND 

B.L. JAMISON FAMILY LIMITED PARTNERSHIP, Appellees

                                                                                                                                               


On Appeal from the 11th District Court

Harris County, Texas

Trial Court Cause No. 99‑38725

                                                                                                                                               


 

S U B S T I T U T E  O
P I N I O N

We overrule the Motion for Rehearing filed by Appellant.  We withdraw the opinion issued on May 26,
2005, and we issue the following substitute opinion in its place. 








Appellees, Bruce L. Jamison and B.L. Jamison Family Limited
Partnership (collectively AJamison@), sued appellant XCO Production Company (AXCO@) for breach of a contract governing
Jamison=s purchase of an interest in certain
oil and gas properties.  The parties
disagree over the interpretation of the contract.  After a jury returned its verdict
interpreting the contract in Jamison=s favor, the trial court entered
judgment for Jamison.

In three issues, XCO contends (1) the trial court erred by
submitting a jury question regarding interpretation of the contract because it
is unambiguous and in XCO=s favor as a matter of law, (2) Jamison=s claim is barred by the four-year
statute of limitations, and (3) Jamison=s claim is barred by a two-year
contractual limitations period.  We
agree  that the contract is unambiguous
as a matter of law, but in Jamison=s favor.  Therefore, we conclude any error in
submitting the jury question was harmless. 
We further conclude  XCO failed to
prove that Jamison=s breach of contract claim is barred by the four-year statute
of limitations or a contractual limitations period.  Accordingly, we affirm.

I. 
Background

XCO is an oil and gas exploration company owned by Robert
Gray.  The company owned working
interests in oil and gas properties in Louisiana.  Southampton Mineral Corporation was the operator
for these properties.  In 1991,  Jamison, who was interested in a low-risk
investment opportunity that would provide tax advantages and future income, was
introduced to Gray by one of Jamison=s friends. 

Jamison and XCO entered into a written AMemorandum of Agreement@ (APartnership Agreement@) effective December 13, 1991,
whereby Jamison purchased a portion of XCO=s working interest in several
Louisiana properties.  The Partnership
Agreement created a tax partnership (APartnership@) between Jamison and XCO.[1]  Under the Partnership Agreement, Jamison made
a $500,000.00 capital contribution to the partnership, and XCO contributed its
working interest in the properties.  The
disputed portion of the Partnership Agreement, paragraph 9, concerns allocation
of income and costs between XCO and Jamison:








9.         Partnership Allocations.  Each item of income, gain, loss or deduction
shall be allocated between XCO and JAMISON as follows:

 

(a)       First, all [intangible drilling costs] and general and
administrative costs paid from December 13, 1991 through December 31, 1992,
shall be allocated to JAMISON, provided, however, that no such amounts shall be
allocated to Jamison which would cause his fair market value capital account to
become negative or increase its negative position; 

(b)       Second, all depreciation with respect to tangibles held by the
Tax Partnership or with respect to the Weldon Operating Agreement and allocable
to the XCO-JAMISON partnership shall be allocated to JAMISON, provided,
however, that such allocations, in the aggregate, shall not cause his fair
market value capital account to become negative or increase its negative
position;

(c)       All costs other than those set forth in paragraphs 9.a and 9.b
of this Memorandum of Agreement shall be allocated to XCO;

(d)       30% of the XCO-JAMISON Partnership=s net revenues, after adjustment for the items of cost
set forth in paragraphs 9.a, b and c of this Memorandum of Agreement, shall be
allocated to JAMISON until such time as he has received $500,000.00 in
distributions from the XCO-JAMISON Partnership (APayout@); the balance of the net revenues shall be allocated
to XCO during such period.

(e)       After Payout,
Jamison shall receive 1.25% of the net profits of the XCO-Jamison Partnership;
the balance of the XCO-JAMISON Partnership=s revenues, and all of its expenses,
shall be allocated after Payout to XCO.








The
parties urge different interpretations of paragraph 9.  In summary, XCO claims paragraph 9 allowed
XCO to deduct all costs, including lease operating expenses, intangible
drilling costs, general and administrative costs, and depreciation, from net
revenues to determine Jamison=s Payout (30% of net revenues).  In contrast, Jamison claims XCO could
allocate to him only the costs listed in subparagraphs (a) and (b) (intangible
drilling costs, general and administrative costs, and depreciation); and once
$500,000.00 in costs were allocated to him, he was entitled to 30% of net
revenues, without regard to costs, until he recouped his initial $500,000.00
investment.

Beginning
in 1992, Southampton issued revenue and expense statements to the XCO-Jamison
Partnership.  The statements showed the
gross income, taxes, royalties, and operating expenses of the various
properties, and the net profit or loss allocable to the aggregated working interests
that partnered with Southampton in the properties.  The statements did not directly show the
amounts to be billed or credited to the XCO-Jamison Partnership, but instead
listed the amounts of ANet to XCO@ and AJamison Net Profit.@  
ANet revenues@ to Jamison, as addressed by
paragraph 9(d) of the Partnership Agreement, were not addressed by these
statements; however, the statements did reflect that Southampton deducted
expenses from AJamison Net Profit@ which were not included in
paragraphs 9(a) or 9(b) of the Partnership Agreement.         

In
mid-1992, an unrelated lawsuit involving the properties was filed against XCO
in Louisiana.  The  Louisiana court ordered that all XCO=s revenues be paid into the registry
of the Louisiana court.  The revenues
were not released until early 1996.  At
that time, XCO told Jamison he would receive no money because costs had greatly
exceeded revenues.








In 1999,
Jamison sued XCO for breach of contract alleging that XCO failed to pay monies
due and improperly charged costs to him. 
Jamison also alleged the Partnership Agreement was ambiguous.  After hearing the evidence, the trial court
determined that the Partnership Agreement was ambiguous and submitted a jury
question regarding its meaning. 
Specifically, the jury was asked, ADid [XCO] and [Jamison] agree that
[Jamison] would be paid 30% of net revenues after Jamison=s $500,000[.00] investment was
expended only on costs allocated to Jamison in Paragraph 9(a) and 9(b) of the
parties= [Partnership] Agreement?@ 
The jury answered Ayes,@ thus interpreting the Partnership Agreement in Jamison=s favor.  The trial court entered judgment awarding
Jamison $417,173.00 in actual damages and $111,500.00 in attorneys= fees, as well as pre-judgment and
post-judgment interest.  

 

II.  Interpretation of the
Partnership Agreement

In its
first issue, XCO contends the trial court erred in submitting the jury question
regarding interpretation of the Partnership Agreement because the contract is
unambiguous in XCO=s favor as a matter of law.[2]

A.        Construction of
Contracts








Our
primary concern in interpreting a contract is ascertaining
the true intent of the parties.  Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); Hewlett-Packard
Co. v. Benchmark Elecs., Inc., 142 S.W.3d 554, 561 (Tex. App.CHouston [14th Dist.] 2004, pet.
denied).  We examine the writing as a whole
in an effort to harmonize and give effect to all the provisions of the contract
so that none will be rendered meaningless. 
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983); Hewlett-Packard,
142 S.W.3d at 561.  We presume that the
parties to a contract intend every clause to have some effect.  Heritage Res., 939 S.W.2d at 121.  We give terms their plain, ordinary, and
generally accepted meaning unless the contract shows the parties used them in a
technical or different sense.  Id.          A contract is not ambiguous if it can
be given a certain or definite meaning as a matter of law.  Universal Health Servs., Inc. v.
Renaissance Women=s Group, P.A., 121 S.W.3d 742, 746 (Tex. 2003); Columbia Gas
Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.
1996).  Lack of clarity does not create
an ambiguity.  Universal Health Servs.,
121 S.W.3d at 746; Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134
(Tex. 1994).  Further, a contract is not
ambiguous simply because the parties advance conflicting interpretations.  Columbia Gas Transmission Corp., 940
S.W.2d at 589; Forbau, 876 S.W.2d at 134.  Rather, a contract is ambiguous if it is
subject to two or more reasonable interpretations after applying the pertinent
rules of construction.  Universal
Health Servs., 121 S.W.3d at 746; Columbia Gas Transmission Corp.,
940 S.W.2d at 589.  If a contract is
ambiguous, a fact issue exists on the parties= intent.  Columbia Gas Transmission Corp., 940
S.W.2d at 589.

In
determining whether a contract is ambiguous, we look to the contract as a
whole, in light of the circumstances present when the contract was executed. Sun Oil Co. (Del.)
v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981); Mescalero Energy, Inc.
v. Underwriters Indem. Gen. Agency, Inc., 56 S.W.3d 313, 319 (Tex. App.CHouston [1st
Dist.] 2001, pet. denied); see also Hewlett-Packard, 142 S.W.3d at 561 (AWe construe a
contract from a utilitarian standpoint, bearing in mind the particular business
activity sought to be served.@).  These circumstances include the commonly
understood meaning in the industry of a specialized term, which may be proven
by extrinsic evidence such as expert testimony or reference material.  See Mescalero, 56 S.W.3d at 320, 323; Zurich Am. Ins. Co. v. Hunt Petroleum
(AEC), Inc. 157
S.W.3d 462, 465 (Tex. App.CHouston [14th Dist.] 2004, no pet.).

Accordingly,
to determine whether the Partnership Agreement is ambiguous, we first examine
the words of the Partnership Agreement, and considering the business activity
to be served, determine the meaning of any specialized term as it is
interpreted in the industry.  We then
must decide whether both parties= interpretations are reasonable.  If only one reasonable interpretation is
offered, we will not find the Partnership Agreement ambiguous, but will enforce
the Partnership Agreement according to its terms.  After examining the Partnership Agreement and
the circumstances present when it was made, we conclude that XCO=s construction is not reasonable,
but Jamison=s interpretation is
reasonable. 

 

 

B.        XCO=s
Interpretation








In support of its argument that only its
interpretation is reasonable, XCO points to subparagraph 9(d) which provides, A30% of the XCO-JAMISON Partnership=s net revenues, after adjustment
for the items of cost set forth in paragraphs 9.a, b and c . . . shall be
allocated to JAMISON . . . .@ (emphasis added). 
According to XCO, Aafter adjustment@ means Asubtract@; thus, all costs, including
the costs set forth in subparagraphs (a), (b), and (c), are to be subtracted
from net revenues before determining Jamison=s 30% Payout.[3]

XCO
states that because Jamison purchased a Aworking interest@ in the properties and a Aworking interest@ is a cost-bearing interest, all
costs had to be deducted from net revenues for Jamison=s interest to be a Aworking interest.@ 
The court-appointed auditor who examined the Agreement in connection
with this suit opined in his report that all costs were to be deducted from net
revenues to determine Jamison=s Payout.  This
interpretation of subparagraph (d), however, creates several conflicts with the
rest of paragraph 9.  See J.M.
Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003) (stating that in
construing contracts, no single provision taken alone will be given controlling
effect; rather, the court must consider the entire contract to harmonize and
give effect to all its provisions, so that none will be rendered meaningless).

First,
under XCO=s interpretation, subparagraph (d)
conflicts with subparagraphs (a) and (b). 
Subparagraphs (a) and (b) state that certain costs are to be allocated
to Jamison=s capital account.  However, according to XCO, under subparagraph
(d), these same costs are to be subtracted from net revenues to determine
Jamison=s Payout.  Therefore, XCO=s interpretation creates a conflict
as to how the costs are to be treated.








Further,
under XCO=s interpretation, subparagraph (d)
conflicts with subparagraph (c). 
Subparagraph (c) provides that all costs other than intangible
drilling costs, general and administrative costs, and depreciation are to be
allocated to XCO.  But, subtracting these
Aother@ costs from net revenues to calculate
Jamison=s Payout, as urged by XCO, would
effectively allocate a portion of these costs to Jamison in contravention of
subparagraph (c).

In
addition, under XCO=s interpretation, there is no limit on the amount of costs
that may be deducted from net revenues to determine Jamison=s Payout.  That reasoning, however, conflicts with
subparagraphs (a) and (b) which provide that Ano such amounts shall be allocated to
Jamison that would cause his fair market value capital account to become
negative or increase its negative position.@ 
Allocating all costs, regardless of amount, to Jamison could cause his
capital account ($500,000.00) to become negative.

Finally,
XCO=s interpretation does not reconcile
the use of the term Anet revenues@ in subparagraph (d) with the use of the term Anet profits@ in subparagraph (e).  According to XCO, under subparagraph (d), all
costs are to be subtracted from Anet revenues@ to determine Jamison=s Payout.  However, under subparagraph (e), after
Jamison=s Payout reaches $500,000.00, he then
receives 1.25% of Anet profits.@  If Anet revenues@ include all costs as urged by XCO,
then the use of the term Anet profits@ in subparagraph (e) is rendered meaningless; it would be
merely synonymous with Anet revenues.@  By using different
terms, the parties recognized the difference between the two terms and
manifested their intention to treat Anet revenue@ separately from Anet profit.@ 
See Sun Oil Co., 626 S.W.2d at 728 (where parties used
different terms for oil and gas in a lease, it was apparent the parties
understood the difference and intended to treat them separately).  XCO=s interpretation fails to explain how
Jamison=s interest converts from a Anet revenues@ interest to a Anet profits@ interest if all costs are already
being deducted from Anet revenues.@

Because
XCO=s interpretation creates several
internal conflicts in paragraph 9, we conclude that XCO=s interpretation is not
reasonable.  








C.        Jamison=s
Interpretation








To substantiate his interpretation of paragraph 9,
Jamison relies on the testimony of Shelly Cashion, his tax lawyer who drafted
the Partnership Agreement.[4]  Cashion testified the Partnership Agreement
was an Aodd duck@ because it included accounting
methodology unique to tax partnerships. 
According to Cashion, in oil and gas taxation, Aallocate,@ Aadjust,@ Anet revenues,@ and Anet profits@ are terms of art.  Cashion defined these terms as follows:

AAllocate@:                 means
to divide tax items among partners. 

AAdjust@:                     is the consequence of that Aallocation.@ AAdjust@ does not mean Asubtract@ or Adeduct.@  Rather, tax items are Aallocated@ to a
partner, and the partner=s capital account is Aadjusted@ to account for that Aallocation.@

ANet revenues@:         means the cash from oil and gas
production minus severance taxes and royalties only.  

ANet profits@: means Anet
revenues@ minus Alease
operating expenses,@ which are the operating costs of the business.

 

Applying these
definitions to paragraph 9, Cashion explained that pursuant to subparagraphs
(a) and (b), intangible drilling costs, general and administrative expenses,
and depreciation are allocated to Jamison=s capital account until his capital
account reaches zero.  In other words,
Jamison receives a total allocation of no more than $500,000.00 in intangible
drilling costs, general and administrative expenses, and depreciation.  Pursuant to subparagraph (c), all other costs
are allocated to XCO=s capital account.








Next,
Cashion explained the operation of the disputed subparagraph (d).  She testified that the phrase Aafter adjustment for the items of
cost set forth in paragraphs 9(a), (b), and (c)@ does not require that all the costs
outlined in subparagraphs (a), (b), and (c) be subtracted from net revenues to
determine Jamison=s Payout.  Rather, the
phrase is a Atiming mechanism.@ 
After these costs are allocated to the respective capital accounts
pursuant to subparagraphs (a), (b), and (c) and Jamison=s capital account reaches zero,
Jamison receives 30% of net revenues until he recoups his $500,000.00 capital
contribution.  Thus, Jamison does not
receive a percentage of net revenues until his capital account is
exhausted.  Further, because the term Anet revenues@ is used, Jamison receives 30% of net
revenues without regard to costs, including lease operating expenses.  In sum, the Partnership spends Jamison=s $500,000.00, then pays Jamison a
percentage of net revenues until Jamison=s initial $500,000.00 is repaid in
full.

Cashion
then stated that pursuant to subparagraph (e), once Jamison recoups his
$500,000.00, his interest would convert to receiving 1.25% of Anet profits,@ which means he is then charged with
a proportionate share of all costs, including lease operating expenses.








We
conclude Cashion=s explanation of paragraph 9 is reasonable because, inter
alia, her definitions of Aallocate@ and Aadjustment@ resolve any conflicts between the subparagraphs.  Further, Cashion=s distinction between Anet revenues@ and Anet profits@ explains the parties= decision to use the term Anet revenues@ in subparagraph (d), and Anet profits@ in subparagraph (e).[5]  It is also consistent with the way in which
tax partnerships use those terms, and with Gray=s own use of the terms in negotiating
the Partnership Agreement.     Jamison=s interpretation is also consistent
with the circumstances existing when the contract was executed and the Aparticular
business activity@ to be served.  See
Hewlett-Packard, 142 S.W.3d at 561
(AWe construe a
contract from a utilitarian standpoint, bearing in mind the particular business
activity sought to be served@).  It is undisputed that, from the outset of
their relationship, Jamison consistently represented to Gray that he wanted a
low-risk investment with maximum tax advantages and an opportunity to get his
capital back.  In return, Jamison was
willing to receive only a small percentage of the net profits over the long
term.  If the parties had agreed that
revenues could be reduced by all potential costs before calculating Jamison=s Payout, as urged by XCO, Jamison=s investment would not have been low-risk.


The most
significant evidence of the circumstances present when the contract was made is
a letter from Gray to Jamison outlining XCO=s proposal.  Gray stated that XCO anticipated incurring a
certain amount of general and administrative costs and intangible drilling
costs in a short time period with respect to the properties.  Gray proposed that Jamison Areimburse@ XCO for these costs.  Gray also proposed that Jamison 

would
receive a defined percentage of XCO=s
monthly production revenues on a preferential basis computed without
regard to expense.  After [Jamison]
had recouped the value of his investment, his interest in the partnership would
convert to a >net profits interest= such that
he would receive a significantly reduced percentage of the net profits
attributable to the partnership.  

 








(emphasis added).[6]  This proposal is consistent with Jamison=s argument that only certain costs
were to be allocated to him; then, he would recoup his investment out of net
revenues without regard to operating costs before his interest converted to a
net profits interest.[7]


Nevertheless,
Gray testified that the portion of his proposal offering to return Jamison=s investment Aon a preferential basis computed
without regard to expense@ was not embodied in the final Partnership Agreement.  According to Gray, Cashion and XCO=s tax lawyer advised him that his
proposal could not be utilized because it created, in effect, a cost-less
interest that would not allow Jamison any tax deductions.

At
trial, however, Cashion explained her concerns with the initial proposal.  She stated that Gray=s proposal would result in Jamison=s immediately recouping his
investment out of net revenues.  Cashion
feared the IRS might view such an arrangement as a loan, rather than an
investment, and thus disallow any deductions. 
Therefore, she and XCO=s tax attorney decided to draft the Partnership Agreement so
as to postpone Jamison=s participation in net revenues until his investment had been
exhausted through allocation of the costs outlined in subparagraphs (a) and
(b).[8]  Therefore, Gray=s proposal that Jamison recoup his
investment on a  Aon a preferential basis computed
without regard to expense@ was embodied in the final Partnership Agreement.  However, Cashion=s tax concerns were alleviated by
modifying the timing for Jamison to recoup his investment.[9]








In sum,
Jamison=s interpretation is reasonable
because it reconciles the subparagraphs of paragraph 9 and is consistent with
the circumstances present when the Partnership Agreement was made and the
particular business activity to be served. 
Because the Partnership Agreement is subject to only one reasonable
interpretation, it is unambiguous as a matter of law.  See Universal Health Servs., Inc.,
121 S.W.3d at 746; Columbia Gas Transmission Corp., 940 S.W.2d at
589.  Therefore, the trial court erred in
submitting a jury question regarding interpretation of the Partnership
Agreement.  See Transcon. Gas Pipeline
Corp. v. Texaco, Inc., 35 S.W.3d 658, 665 (Tex. App.CHouston [1st Dist.] 2000, pet.
denied) (stating that a trial court errs when it does not construe an unambiguous
provision as a matter of law, and instead, submits the issue to a fact
finder).  However, the error is harmless
because the jury interpreted the Partnership Agreement in Jamison=s favor.  See Tex.
R. App. P. 44.1(a)(1); see also Med. Towers, Ltd. v. St.
Luke's Episcopal Hosp., 750 S.W.2d 820, 826 (Tex. App.CHouston [14th Dist.] 1988, writ
denied) (absent a showing of some prejudice, submission of a question of law to
the jury is harmless since the trial court can always use the jury=s findings as advisory only).   Accordingly, we overrule XCO=s first issue.

III.  Four-Year Statute of Limitations

In its second issue, XCO contends that Jamison=s breach of contract claim was barred
by the four-year statute of limitations as a matter of law.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 16.004 (Vernon 2002).  

A.        Accrual Of The Cause of Action








A breach of contract occurs when a
party fails or refuses to do something he has promised to do.  Townewest Homeowners Ass'n, Inc. v. Warner
Communication Inc., 826 S.W.2d 638, 640 (Tex. App.CHouston [14th
Dist.] 1992, no writ).  The court determines what conduct is
required by the parties, and, insofar as a dispute exists concerning the
failure of a party to perform the contract, the court submits the disputed fact
questions to the jury.  Meek v.
Bishop, Peterson & Sharp, P.C., 919 S.W.2d 805, 808 (Tex. App.CHouston [14th Dist.] 1996, writ
denied).  Where reasonable minds may differ
as to the inferences to be drawn from the evidence, it is incumbent upon the
party asserting limitations to secure findings sustaining the plea of
limitations.  Intermedics, Inc. v. Grady, 683 S.W.2d 842,
845 (Tex. App.CHouston [1st Dist.] 1984, writ ref=d n.r.e.).  The failure to request a jury instruction
on an affirmative defense results in waiver of that ground by the party relying
on it unless the issue was conclusively established.  See Tex.
R. Civ. P. 279; Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d
741, 764 (Tex. App.CEl Paso 2000, no pet.). When facts are undisputed or
conclusively established, there is no need to submit those issues to the jury.  Sullivan v. Barnett, 471 S.W.2d 39, 44
(Tex. 1971); Meek, 919 S.W.2d at 808. 

XCO
contends that Jamison=s claims are barred by the statute of limitations; therefore,
the burden fell on XCO to plead and prove that the cause of action accrued more
than four years before Jamison filed suit on July 30, 1999.  See Woods v. William M. Mercer, Inc.,
769 S.W.2d 515, 517 (Tex. 1988) (limitations is an affirmative defense, which
the asserting party must prove); Brown v. Zimmerman, 160 S.W.3d 695, 702
(Tex. App.CDallas 2005, no pet.) (the party
asserting an affirmative defense has the burden of pleading and proving its
elements).  XCO argues that Jamison=s cause of action accrued Awhen XCO allegedly breached the
contract by deducting more than $500,000.00 in workover costs when calculating
net revenue.@ 
XCO alleges that if a breach occurred, it occurred Awhen XCO sent Jamison the February
and March 1993 [accounting] statements.@ 









Jamison
responds that these statements do not prove the breach of contract occurred in
1993 for several reasons, including (1) Jamison=s receipt of erroneous accounting
statements by Southampton does not constitute a breach of contract by XCO,
particularly where XCO admits that the statements are erroneous; (2) XCO did
not refuse to pay Jamison=s share of net revenues in February 1993 because the revenues
were frozen by a court, and therefore, XCO either had no Anet revenue,@ or if it did, the distributions were
not due and payable while they were sequestered by court order; (3) the time
for performance was extended by XCO=s reassurances that Southampton=s statements were erroneous, and that
the accounting would be corrected and funds distributed after the funds were
released from the court; (4) XCO admits that the accounting statements contain
errors; (5) Southampton=s 1993 account statements could amount to no more than an
anticipatory breach by XCO, and the statute of limitations begins to run on a
promisor=s breach/repudiation of a contract
only if the repudiation is adopted by the non-repudiating party; and (6) even
if a breach occurred in 1993, the statute of limitations was tolled while the
funds were held in the registry of the court.

1.         Southampton=s Statements Are Not Attributable to
XCO.

XCO is not only the appellant, but also bore the
burden of proof to establish its limitations defense at trial; we therefore
address its argument first.  

XCO contends
that to the extent it breached the contract, the breach occurred when XCO sent
Jamison accounting statements in 1993 that allegedly demonstrated XCO=s improper deduction of expenses from
Jamison=s account; but, Jamison correctly
points out that the statements relied upon by XCO were actually issued by
Southampton to the XCO-Jamison Partnership. 
XCO responds that Southampton=s accounting statements to the
Partnership constitute XCO=s statements to Jamison because the Partnership Agreement
states that Southampton is the Operator, and because XCO=s president is also the president of
Southampton.  Additionally, XCO points
out that Southampton=s office address shown on the statements is the same as XCO=s office address.








Texas law
presumes that two separate corporations are distinct entities, and Aa party seeking to ascribe one
corporation=s actions to another by disregarding
their distinct corporate entities must prove this allegation.@ 
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex.
2002).  Although XCO=s arguments on appeal treat the two
entities as one, none of the parties took the position in their pleadings or at
trial that XCO and Southampton are constructively the same entity, nor was the
jury asked to find that either company owned, controlled, or dominated the
other.[10]  The Partnership Agreement also treats XCO and
Southampton as separate entities. 
Moreover, Southampton=s statements to the Partnership do not purport to represent
XCO=s accounting of the intra-Partnership
allocations required by the Partnership Agreement.[11]  The statements bear no indication that they
were prepared by

 XCO, make no mention of the Partnership
Agreement, do not report on XCO and Jamison=s capital accounts, and do not
perform the calculations required by the Partnership Agreement.  








We
further note that a cause of action accrues and the statute of limitations
begins to run when facts come into existence that authorize a party to seek a
judicial remedy.   Johnson &
Higgins of Tex., Inc., 962 S.W.2d 507, 514 (Tex. 1998).  Stated another way, a cause of action can
generally be said to accrue when the wrongful act effects an injury, regardless
of when the plaintiff learned of such injury. 
Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex. 1990).
Even assuming that Jamison could have complained of errors in Southampton=s statements, we are aware of no
authority to support the proposition that Southampton=s statements triggered Jamison=s right to a judicial remedy against
XCO.  The statements were not
prepared pursuant to or in accordance with the Partnership Agreement, and imply
nothing regarding XCO=s intent to abide by its terms.  Moreover, XCO did not claim that Southampton=s statements were correct; to the
contrary, XCO admitted that the statements contained errors.  XCO did not represent to Jamison that it
would adopt the Southampton=s accounting conclusions; to the contrary, XCO represented
that it would correct the accounting statements and pay Jamison the net revenue
due him when the funds were released from the Louisiana court.  Finally, XCO has not shown that Southampton=s erroneous statements injured
Jamison.  See Southwell v. Univ. of
the Incarnate Word, 974 S.W.2d 351, 354B55 (Tex. App.CSan Antonio 1998, pet. denied) (to
prove an action for breach of contract, the plaintiff must establish the
defendant=s breach caused injury).  Under these circumstances, Southampton=s statements would not have supported
a breach of contract claim by Jamison against XCO. 

However,
our analysis does not end here.  Because
the arguments and evidence adduced by Jamison offer independent grounds for
affirmance, we address those as well.

2.         XCO Did Not Refuse to Pay Net Revenue
Before 1996. 

 

Jamison contends that XCO=s failure to pay Jamison in 1993B1995 was not the result of a breach
of contract, but was instead caused by the Louisiana court=s retention of the funds from 1992
until the early part of 1996. 
Specifically, Jamison claims that prior to 1996, XCO did not refuse to
pay net revenues that were Adue and payable@ because (a) there was no refusal to
pay, (b) there was no net revenue, and (c) if there was net revenue, it was not
Adue and payable@ until released by the court.








XCO
argues that Southampton=s accounting statements should have alerted Jamison that XCO
would not pay Jamison in accordance with the Partnership Agreement; however,
both Jamison and Gray testified that the first time Gray or any of XCO=s representatives ever told Jamison
or any of Jamison=s representatives that Jamison would not be paid was between
January and March of 1996.  According to
Jamison, while the revenues were frozen, XCO reassured Jamison that he would
receive his Payout when the revenues were released.  Specifically, Jamison testified without
contradiction that while the revenues were frozen, he asked Gray periodically
about the status of the Louisiana suit. 
Gray responded that the suit was going well and said, Adon=t worry[,] your money is in
there.  Once we wrap this up, you=re going to get your money.  You are due your money, your net revenue.@ 
Jamison also testified that during 1992, he addressed with Gray whether
his $500,000.00 investment was being properly allocated.  Gray responded that XCO=s accounting was a Amess,@ and Awe really don=t know whether it is expended or not
expended or whatever, but it doesn=t matter because you=re. . . going to get paid on this
anyway because you=re going to get your $500,000[.00].@ 
Thus, the first Arefusal to pay@ occurred in 1996, fewer than four
years before Jamison filed suit.          Moreover, the existence and extent of Anet revenue@ available to the Partnership is a
question of fact that was not presented to the jury.  Because XCO claimed Jamison=s suit was time-barred, XCO bore the
burden to obtain findings of fact necessary to support this affirmative
defense.  Having failed to do so, we
cannot say that Jamison=s cause of action accrued during a time when net revenues
were not proven.[12]         

In sum,
we conclude XCO did not prove as a matter of law that Jamison=s claim accrued more than four years
before Jamison filed suit.[13]

IV.  Contractual Statute of Limitations

In its third issue, XCO contends that Jamison=s breach of contract claim was also
barred by a contractual time limitations clause.  This argument was raised for the first time
in XCO=s motion for judgment notwithstanding
the verdict.  Although an answer filed
jointly by XCO, Robert Gray, and Southampton asserts that Aany claims for an accounting are
restricted by the applicable limitations period of the Joint Operating
Agreements attached to the [Partnership Agreement],@ XCO did not assert that the
agreements between Southampton and the non-operators barred Jamison=s claim that XCO breached its
Partnership Agreement with Jamison. 

The
Partnership Agreement gives Jamison a part of XCO=s share in the Lake Boeuf Operating
Agreement, the Weldon Operating Agreement, and the Lake Boeuf Tax Partnership
(collectively, the AOperating Agreements@). 
The terms of each of these Operating Agreements, Aexcept to the extent expressly
inconsistent [with the Partnership Agreement],@ are incorporated into the
Partnership Agreement.  The Operating
Agreements incorporate the AAccounting Procedure and Joint Operations@ agreement (AAPJO Agreement@) between Southampton, as the
operator, and the non-operator parties to the Operating Agreements.  The APJO Agreement addresses Southampton=s statements and billings to
non-operators, and provides in pertinent part: 

[A]ll bills
and statements rendered to Non-Operators by Operator during any calendar year
shall conclusively be presumed to be true and correct after twenty-four (24)
months following the end of any such calendar year, unless within the said
twenty-four month period a Non-Operator takes written exception thereto and
makes claim on Operator for adjustment.

 

According
to XCO, this provision imposed a two-year limitations period for Jamison to sue
XCO regarding improper deductions from net revenues during a given year.  We disagree. 


            








This
provision applies to accounting procedures between the operator and the
non-operators.  Southampton is the
operator for these properties; XCO and other entities were the non-operators.  Jamison purchased a portion of XCO=s non-operator interest in the
properties under a separate Partnership Agreement, and his dispute is with XCO
over the terms of that Partnership Agreement. 
Jamison=s dispute is not with
Southampton.  In short, this dispute is
not between the operator and a non-operator. 
Rather, this dispute is between two partners who together constitute a
single non-operator.  Therefore, this
provision does not impose a two-year contractual limitations period on Jamison
with respect to his breach of contract claim against XCO.[14]  We overrule XCO=s third issue.








V. 
Conclusion 

In sum, we hold the Partnership Agreement is
unambiguous as a matter of law, but in Jamison=s favor.  We further hold that XCO failed to prove that
Jamison=s breach of contract claim was barred
by the four-year statute of limitations or a contractual limitations
period.  Accordingly, we affirm the
judgment of the trial court.

 

 

 

/s/        Eva M.
Guzman

Justice

 

 

 

Judgment
rendered and Opinion filed April 28, 2006.

Panel
consists of Chief Justice Hedges and Justices Edelman and Guzman.











[1]  XCO and
Jamison were considered partners for federal income taxation purposes
only.  They were not considered partners
with respect to liabilities and obligations under state law.  Jamison=s tax
attorney testified that the federal government permits this type of arrangement
to stimulate oil and gas investment.





[2]  In its brief,
XCO frames its first issue in several different ways.  However, the theme of its complaint is that
the trial court erred in submitting the jury question because the Partnership
Agreement is unambiguous as a matter of law. 
XCO does not challenge the sufficiency of the evidence supporting the
jury=s finding.





[3]  According to
XCO, these costs include all lease operating expenses, in addition to
intangible drilling costs, general and administrative costs, and
depreciation.  The lease operating expenses  are at the center of this dispute.  There is evidence that lease operating
expenses are the primary type of other costs addressed in subparagraph (c).  Further, XCO deducted large amounts of lease
operating expenses from net revenues pursuant to its interpretation of the
Partnership Agreement. 





[4]  XCO contends
that Cashion=s testimony, as well as all evidence regarding the
parties= intent, is inadmissible parol evidence.  Extrinsic evidence is not admissible to
create an ambiguity or vary the terms of an unambiguous agreement; however,
when determining whether an agreement is ambiguous, we may examine extrinsic
evidence to interpret the terms used by the parties and extrinsic evidence of
the circumstances surrounding execution of the agreement.  See Belandran v. Safeco Inc. Co. of Am.,
972 S.W.2d 738, 741 (Tex. 1998); Nat=l
Union Fire Ins. Co. of Pittsburgh,
Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995); Sun Oil Co.,
626 S.W.2d at 731.  Expert testimony may
be particularly useful in explaining the Acommonly
understood meaning in the industry of a specialized term.@ Mescalero, 56 S.W.3d at 320, 323; Zurich
Am. Ins. Co., 157 S.W.3d at 465. 
Jamison offered the testimony of Ms. Cashion, as well as the testimony
of its expert who reviewed the Partnership Agreement in connection with this
suit for this purpose.  XCO also offered
the report of the court-appointed auditor, who agreed with XCO=s interpretation. 
This evidence was not admitted to create an ambiguity or to vary the
terms of the Partnership Agreement, but to explain its specialized terms.





[5]  XCO has not
offered a contrary definition for the terms used in the Partnership Agreement
that is reasonable.  In his report, the
court-appointed auditor stated that a Anet
revenues@ interest is substantially the same as a Anet profits@
interest for purposes of this Partnership Agreement.  This fails to explain the use of the two different
terms in subparagraphs (d) and (e). 
Further, the auditor stated that his audit was based on Council of
Petroleum Accounting Societies (COPAS) principles.  Jamison=s expert
testified that COPAS explicitly defines Anet
revenues@ as gross proceeds less royalties and severance taxes;
and COPAS explicitly defines Anet profits@ as
gross proceeds less royalties, severance taxes, and operating
expenses.  In fact, later in his report,
the auditor seems to acknowledge that the terms are not the same.  In particular, the auditor later summarizes
the partnership=s revenues, costs, and Jamison=s interest.  The
auditor has two separate categories entitled: ANet
Revenues allocated to Jamison (per paragraph 9d of the [Partnership Agreement])@ and ANet Profit Interest (per paragraph 9e of the
[Partnership Agreement]).@  With respect
to the latter category, the auditor notes that the net profit interest A[i]s not applicable until such time that the Net
Revenue distribution reaches $500,000[.00].@





[6]  Gray attached
a pro forma projecting production from the properties on a monthly basis and
Jamison=s corresponding potential return on his
investment.  Gray proposed two
alternatives based on Jamison=s contribution of 
$500,000.00 or $1 million.  The
pro forma shows Jamison=s potential return under both scenarios.  Under both scenarios, Jamison=s return is 30% of net revenues without regard to
expenses.





[7]  Craig Crawford,
Jamison=s friend who introduced him to Gray, testified that
Gray outlined a general proposal during their initial meetings.  Gray represented that Jamison would be given Apreferential treatment@ on the Afront end@ until
he recouped $500,000.00; Jamison would then receive a smaller residual interest
on the Atail end.@





[8]  XCO=s tax attorney did not testify, and, thus, did not
controvert Cashion=s explanation.





[9]  Cashion also
testified regarding two other changes between the proposal and final
Partnership Agreement, as well as a subsequent amendment.  However, these changes and amendment are not
pertinent to this dispute. 





[10]  Robert Gray
owns 100% of XCO and 50% of Southampton. 
Although Jamison alleged that Gray was the alter ego of XCO and
Southampton, the allegation was denied by Gray, XCO, and Southampton.





[11]  For example,
Southampton=s February 1993 accounting statement lists the gross
revenue, taxes, royalties and operating expenses associated with the various
properties, and from these figures, calculates the Anet to working interests.@  The statement
then lists Anet to XCO@ and AJamison net profit,@ though
it is undisputed that Jamison had not received $500,000.00 in distributions at
this time.  In contrast, the Partnership
Agreement requires the calculation of Jamison=s net
revenueCnot net profitCuntil he
receives $500,000.00 in distributions. 
Thus, Southampton=s calculation of AJamison
net profit@ is not the equivalent of  XCO=s
required calculation of Jamison=s net revenue. 
This particular statement also indicates that a Aworkover@ expense
of $869,700.00 for the St. Charles Church well was charged against the Anet to working interests@ and
deducted in part from both Anet to XCO@ and AJamison net profit.@  Southampton therefore lists AJamison net profit@ as a
negative number, despite the fact that Jamison had not reached APayout@ and his interest had not yet converted from net
revenue to net profit.





[12]  Jamison
additionally argues that, under the doctrine of impossibility, a party
prevented by a government order from performing his contractual obligation is
excused.  See Centex Corp. v. Dalton,
840 S.W.2d 952, 954 (Tex. 1992). 
Reasoning that it was impossible for XCO to distribute Jamison=s net revenue while it was held in the registry of the
court, Jamison argues that the statute of limitations should therefore be
tolled as well.  XCO responds that this
proposition has never been part of the law of limitations.  But see Fed. Trust Co. v. Brand, 76
S.W.2d 142, 144 (Tex. Civ. App.CAmarillo 1934, writ ref=d.) (AIt is settled law in Texas and elsewhere, so far as we
have been able to ascertain, that limitation does not run while property is in
the custody of the law.@); see also Madeksho v. Abraham, Watkins,
Nichols & Friend, 112 S.W.3d 679, 688 (Tex. App.CHouston [14th Dist.] 2003, no pet.) (en banc) (per Brister, C.J., with three
justices concurring and one justice concurring in result only) (Afunds in the registry of the court are held in
custodia legis, and thus exempt from claims by third parties.  There is no point in requiring an earlier
interpleader if no one can file claims to the funds until after the mandate
issues and the funds are released.@)
(emphasis added).  Because the existence
and extent of Anet revenue@ due to
Jamison were not determined at trial, we do not reach this issue.  





[13]  XCO also
asserts that the trial court erred by submitting a jury question that asked if,
prior to July 30, 1995 (i.e., four years before suit), Jamison discovered or
should have discovered facts causing him to believe he had a claim for breach
of the Partnership Agreement.   The jury
answered, Ano.@  Because XCO
failed to prove that Jamison=s cause of action accrued more than four years before
suit, the discovery rule is inapplicable. 
However, submission of the jury question was harmless, because XCO did
not establish that a breach of the Partnership Agreement occurred before July
30, 1995.  See also City of
Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995) (ASubmission of an improper jury question can be
harmless error if the jury's answers to other questions render the improper
question immaterial.@). 





[14]  On appeal, XCO
contends for the first time that this limitations provision applies to
accounting disputes between XCO and Jamison because Gray was an officer of both
XCO and Southampton, Southampton issued Jamison=s
checks, and Southampton sent Jamison accounting statements from the same
address as XCO.  These facts do not
change the terms of the Operating Agreements or the APJO Agreement.  Those agreements state, and XCO admits, that
Southampton is the operator.  This
limitations provision governs accounting between the operator and non-operator.  It does not impose a limitations period on
Jamison=s suit against XCO.